UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ALEXANDER PRODES,                         )
                                          )
        Plaintiff,                        )
                                          )
    vs.                                   )          Case No. 4:09CV1646 CDP
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
        Defendant.                        )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Alexander Prodes' application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §

401, *et seq*. and supplemental security income under Title XVI of the Act, 42

U.S.C. §§ 1381, *et seq*.  Claimant Prodes brings this action asserting both physical

and mental disability because of diabetes, depression, and bipolar disorder.  The

Administrative Law Judge concluded that Prodes was not disabled.  Because I find

that the decision denying benefits was supported by substantial evidence, I will

affirm the decision.

## Procedural History

On August 27, 2007, Alexander Prodes field for Period of Disability and

Disability Insurance Benefits.  The Social Security Administration denied the

claim, and a timely hearing request was filed.  On January 25, 2008, Prodes filed

for Supplemental Security Income payments which was escalated to the hearing

level.  Prodes then appeared and testified at a hearing held on January 30, 2009.

The Administrative Law Judge issued an opinion on March 4, 2009 upholding the

denial of benefits.  On August 19, 2009, the Appeals Council for the Social

Security Administration denied Prodes request for review.  The ALJ's

determination thus stands as the final determination of the Commissioner.  Prodes

filed this appeal on October 4, 2009.

<u>Claimant's Testimony Before the ALJ</u>

Prodes testified that he was 46 years of age, 5'8" tall, and 198 pounds at the

time of the hearing.  He had three degrees, including a bachelors degree in

philosophy, a masters degree in education, and a masters degree in divinity.  He

also spoke both English and Greek.  Prodes had been living in a one bedroom

apartment by himself for the past three years.  He had been supported, up to the

time of his hearing, by his parents and unemployment benefits.  Prodes indicated

that he had been receiving unemployment benefits since August of 2007 and those

benefits were scheduled to end in April of 2009.  He testified that to obtain

unemployment benefits he said that he was able to work and made three job

contacts per week. Prodes was also receiving Medicaid at the time of the hearing.

Prodes alleged disability since July 17, 2007. Specifically, he alleged disability as a result of diabetes, depression, and bipolar disorder. The testimony relevant to his alleged physical disability included Prodes stating that he had uncontrolled diabetes requiring him to take four shots of insulin and two pills each day. He claimed that diabetic neuropathy in his feet caused constant pain and numbness that brought him to tears and frustrated him. Prodes initially said he could not "stand at all" within the year leading up to his hearing, but later detailed activities that required him to both stand and walk. He stated that a couple of his toe nails had fallen off and he had to take sleeping pills to get to sleep at night because the pain and numbness in his feet kept him up. He further alleged high blood pressure, high cholesterol, and diverticulitis which were all controlled by medication. Additionally, Prodes testified that his hands started to shake in 2003, and had gotten worse within the year leading up to his hearing. As for his mental condition, Prodes stated that the mental impairments cause him to be depressed all the time, very angry, stressed out, lacking in patience to be around anyone or do anything, and requiring medication. The alleged side affects of his medication included constant fatigue, constant diarrhea, dizziness, and blurred vision, however, a change in medication had helped with the diarrhea.

Prodes testified that, over the 15 years prior to his hearing, he worked as a second priest for almost five years; case worker and program supervisor assisting

the mentally handicapped with daily tasks such as bathing, shopping, going to doctor's appointments, and cleaning for less than a year an a half with two separate employers; shift manager-in-training at McDonalds for approximately eight months; and temporary employee with various employers for no more than two weeks at a time.  Prodes stated that he decided to resign from the ministry after being suspended for having an inappropriate internet conversation with a minor female and that he voluntarily returned from ordained to layman's status. He was divorced around the same time.  He also quit working as a program supervisor because he did not get along with his bosses.  He quit McDonalds on July 17, 2007, because he was unable to stand as a result of the numbness in his feet.  Prodes claimed that the inability to stand prevented him from working the grill and he could not lift the ice tea, which weighed from 25 to 30 pounds.  Prodes estimated that his last employment as a temporary worker was some time in August of 2007 which he quit because he could not do it anymore.

At the time of hearing, Prodes woke up between 9:00 a.m. and 10:00 a.m., took a nap from 2:00 p.m. to 5:00 p.m., and went to bed at 10:00 p.m. with sleeping pills.  Otherwise, he characterized himself as a loner who stayed his apartment unless checking mail, doing laundry once each month, going to the grocery store once or twice each week, or attending a doctor's appointment once each month.  Prodes testified that his mailbox was located 50 feet away from the

apartment on the same level and the laundry room was located 100 yards away, but getting to the laundry room caused him to take stairs. He used to do laundry weekly and walk to the facility, but, at the time of the hearing, he was only going monthly and driving his car because his arms and shoulders shook when carrying the basket and walking fatigued him. He went to the grocery store at night to avoid people. He carried his own groceries, but did not purchase gallons of milk because he was unable to lift the container. Prodes spent most of his time watching television, only cooked with the microwave, and used his dishwasher. The pain in his feet caused him to move around, so out of eight hours he could stand for one hour, sit for two hours, and spent the rest lying down. He did, however, have his minor children over once per week for supervised visitation and traveled on an airplane to Pennsylvania to see his parents in June of 2008. According to Prodes, up until six months prior to the hearing he was walking one mile to the library.

Prodes testified that he noticed deterioration in his concentration and focus over the year leading up to his hearing requiring him to write things down and found himself simply staring at the television or out his balcony window at times. He also stated that his pace was very slow and his lack of motivation caused him to put things off. He was able to make his doctor's appointments, but doing so required him to refrain from taking his sleeping pills and to set two alarms.

<u>Medical Evidence Before the ALJ</u>

On May 28, 2004, Prodes was admitted to St. Anthony's Medical Center for major depression and pathological gambling. Before being admitted he had not been on any medication for almost a year. He complained of general malaise,[1] but walked normally with normal gait and did not complain of pain or numbness. Prodes was diagnosed with major depression that was both recurrent and severe. He was given several medications. On June 3, 2004, he was discharged as mildly depressed and prescribed more medications, including insulin.

On March 3, 2006, Prodes saw Aaron Bjorn, MD. Dr. Bjorn diagnosed Prodes as diabetic and instructed him to make and bring in a blood sugar log for their next appointment. He also diagnosed bipolar disorder and noted what appears to be Prodes' statement that he was psychologically stable when on medication. On March 7, 2006, Prodes reported some foot numbness, but no pain and did not bring his blood sugar log. On May 8, 2006, Dr. Bjorn noted that Prodes blood sugar levels were much better. On July 10, 2006, he noted that Prodes blood sugar levels were better in the morning, but were not being monitored at any other time, and his bipolar disorder was stable. Dr. Bjorn again

---

[1]Malaise is defined as "a feeling of general discomfort or uneasiness, an out-of-sorts feeling, often the first indication of an infection or other disease." *Stedman's Medical Dictionary* 914 (25th ed. 1990).

instructed Prodes to make and bring in a blood sugar log for their next appointment.

On October 25, 2007, Prodes saw Lois Mades, Ph.D. for a consultative exam. Prodes was not on diabetes medication at the time and reported that he consumed 68 ounces of soda per day and an occasional tea or coffee. He stated that he had not seen a psychiatrist in about a year and complained of severe depression, restlessness, occasional suicidal thoughts without intent or plan, and compulsive hand washing. Dr. Mades, however, did not notice red or chapped hands as would likely have been the case if Prodes had been compulsively washing his hands. Prodes also noted that he enjoyed napping, watching television, walking, and visiting with his children. He stated that he got along adequately with others, but noted decreased socialization and irritability. Dr. Mades opined that Prodes was cooperative, pleasant, alert, coherent, logical, sequential, had a normal gait with good eye contact, and was able to maintain adequate attention and concentration with appropriate persistence and pace. His mood was found to be mildly depressed with a slightly restricted and generally appropriate affect. Dr. Mades diagnosed major depressive disorder with a mild single episode and assigned a Global Assessment Function of 65.[2] She stated that

[2]"The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937, n.1 (8th Cir. 2009) (quoting the Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994)

his symptoms were more consistent with major depressive disorder than bipolar disorder and stated that he would be fair to good with appropriate intervention.

On October 25, 2007, Prodes also saw Loreta Mendoza, MD for a consultative exam. Prodes reported symptoms and habits similar to those he shared with Dr. Mades. He also shared that he was walking approximately two miles two to three times each week to see his children. Dr. Mendoza's observed a normal gait and an ability to heel walk, but difficulty tiptoeing and an inability to completely squat because of discomfort in his lower extremities. She noted that Prodes was only able to squat about two-thirds of the way. Dr. Mendoza diagnosed uncontrolled diabetes with a blood sugar level above 400 and peripheral neuropathy manifested with numbness and tingling in the bottom of both feet and leg cramping. She further observed numbness on pin pricking in both feet and hypertrophy of the toe nails on the left foot.

On December 12, 2007, Prodes went to South County Health Center where he saw Christine Jones, MD. He reported severe pain and swelling in his feet for the past six years aggravated by any movement and causing difficulty wearing shoes, but stated that he had not been on medication for one year. Dr. Jones found

---

(DSM-IV)). A GAF of 61 to 70 indicates some mild symptoms (e.g. depressed mood or mild insomnia) or "some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships." *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010).

he was alert, cooperative, had a normal gait, and was prescribed diabetes medications.

On January 14, 2008, Prodes reported to Dr. Jones that he had not taken medication for his alleged bipolar disorder, Depakote, for two years and that he did not notice any benefit from the mediation. He stated that he was currently feeling depressed and lacked motivation. Prodes was started on Effexor and Lamictal and given a Global Assessment Function of 50/55.[3]

On January 23, 2008, at South County Health Center, Prodes saw Heather Barker, M.Ed. and shared that he had been sexually propositioned by a pastor who molested his brother and cousin when Prodes was16 years old. He stated that when he was a teacher, at age 28, he had relationships with girls who were 16 and 17. He also stated that he knew his internet relationship with a 14 year old girl, when he was a pastor, was wrong, but he was unable to control himself. Prodes reported that he was always crying during the day, had a terrible outlook, and only felt happy or had fun when seeing his children.

On January 30, 2008, Prodes told Barker that his marriage ended because his wife did not put him first, siding with his family on certain issues, and because of infertility since he believed children made a positive difference and gave

---

[3]A GAF of 41-50 indicate that the individual has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32. A GAF of 51 to 60 indicates the individual has "[m]oderate symptoms ... or moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

meaning and purpose to life. Prodes concluded that he was healed from seeking out younger women after the situation that ended his pastoral career scared and repulsed him. He notice positive changes from his three weeks on medication in that he had not cried that week and was a lot calmer. Prodes was also very encouraged about being able to work again. Barker suggested a bipolar support group encouraging Prodes to connect with others.

On February 4, 2008, Prodes again visited Dr. Jones at South County Health Center. He was doing ok with a mood that was a "little stable" and thought the medication was helping a bit. He stated that he was feeling slightly anxious because his unemployment benefits would end the following month, but was working with rehabilitation services to find a job. Prodes was sleeping ok and his physical health was better because of regular medication. Dr. Jones also noted a significant history of non-compliance.

On February 6, 2008, Prodes told Barker that he had received his last unemployment check that day, but another doctor was filling out paperwork for vocational rehabilitation so that he could work with them to find a job. The doctor encouraged him to look for part-time employment on his own. Prodes responded that he had done so, but believed his former employers might be giving negative references because he was not mentally well when employed at those companies.

Barker provided a phone number for other support group options because transportation was problematic for the bipolar support group timing.

On March 3, 2008, Prodes again told Dr. Jones he was doing ok with a mood that was a "little stable" and again stated that he thought the medication was helping a bit. He was, however, feeling slightly depressed and bogged down because of the financial difficulties that resulted from his unemployment running out and not working. He again reported that he was working with rehabilitation services to find a job. Prodes was sleeping ok.

On March 5, 2008, Prodres told Barker he was feeling very depressed mostly because he did not have an income outside his parent's assistance and because he could not be with or provide for his children. On March 12, 2008, Prodes told Barker he was talking to someone about switching clinic doctors and discussed his discomfort with his ex-wife's boyfriend. On March 26, 2008, Prodes told Barker he would begin seeing Kyra Cass, MD and discussed ways to approach the role of his ex-wife's boyfriend.

On March 27, 2008, Prodes saw Dr. Cass at South County Health Center. He stated that he did not like his last doctor, had lost control of his bowels, urinated on himself, and believed he was sleep walking because he would wake and find lights on or would have skinned knees without remembering having gotten up. He reported feeling groggy in the morning because of medicines he had

been given the month before. Prodres had also thrown up a small amount of blood on the same night he reported having had a bad dream. Dr. Cass concluded that Prodes had irritable bowel syndrome, bipolar disorder, and a lot of stress. She also noted that he had no pain and a full range of motion before prescribing a number of medications. On March 31, 2008, Prodes reported still feeling some depression, so Dr. Cass increased his medication.

On April 9, 2008, Prodes told Barker he would no longer be speaking to his ex-wife, had shame regarding his children, and had received a letter from vocational rehabilitation stating that he could start their program. He was happy about starting the program and had scheduled meetings with a Greek Orthodox pastor for additional counseling related to his family. Barker commended him starting the program and seeking additional counseling.

On April 23, 2008, he told Dr. Cass that he was feeling fatigue throughout the day which his medication was not helping, that he had regained control of his bowels yet still had frequent diarrhea, maintained a blood sugar level of 180-50, was eating not so great food, and was willing to give up soda. He further stated that he was walking two to three miles daily. Dr. Cass noted that Prodes' neuropathy improved with medication, but the medication could have been attributing to his uncontrolled blood sugar.

On April 23, 2008, Prodes told Barker he was frustrated that his services were switching to Medicaid which did not allow him to use the transportation he had been using. He believe he would be charged for services he was not using, but Barker and Prodes called another transportation provider during their session and learned that he would not be charged and would not have to be picked up early. Barker used this as a lesson in corrective behavior as an alternative to jumping to conclusions.

On May 7, 2008, Prodes told Barker it would be his last session because Medicaid did not allow him to be a psychiatry or counseling patient there. His last session was a review of progress and goals with his new psychiatrist.

On May 21, 2008, Prodes came in complaining of fatigue and isomnia, but had to leave and reschedule before seeing Dr. Cass because his ride service had come. On May 27, 2008, Prodes saw Zachary Newland, DPM at South County Health Center. He complained of pain in his feet at night with numbness and tingling during the day. Newland prescribed medication.

On June 11, 2008, Prodes told Dr. Cass that his blood sugar was between 150-180, one of the medications he was taking bothered his stomach, he was going to court that month regarding the custody of his children, and that he walked two miles daily. Dr. Cass prescribed medications.

On July 10, 2008, Prodes was treated at St. Alexius Hospital's emergency room with complaints of bleeding from the rectum and flank pain. Prodes stated that he had felt the pain for two to three days and described it as crampy and intermitten. Prodes was discharged that same date with a diagnosis of acute diverticulitis, prescriptions for medication, and instructions to maintain a clear liquid diet and follow up with his doctor in one week.

On August 26, 2008, Prodes told Dr. Newland his toenails were discolored, and he had trouble sleeping at night because of foot pain. Dr. Newland increased one of his medications.

On September 11, 2008, Prodes again saw Dr. Cass complaining of daily pain, numbness, tingling, and cramping in his feet causing him to do less walking. Dr. Cass noted that Prodes had been resistant to insulin, but was "way out of control." Dr. Cass started him on insulin and other medications.

On September 15, 2008, Prodes was referred, by his attorney, to F. Timothy Leonberger, Ph.D. for a consultative exam. Prodes told Dr. Leonberger he had not exercised or followed his diet very well. With respect to his psychological state, Prodes noted that he enjoyed watching sports on television, walking, and going to the library. Dr. Leonberger observed that Prodes was depressed, sad, and blunted, but thinking logically and sequentially with no evidence of a thought disorder, fair attention and concentration, and no unusual gait or motor abnormalities. Dr.

Leonberger did not believe Prodes demonstrated any bipolar symptoms, nor had he been through a manic episode. Prodes was diagnosed with major depressive disorder that was recurrent and severe, without psychotic features. He also had mild to moderate impairment in his ability to perform activities of daily living, marked impairment in his ability to function socially, marked impairment in his concentration, persistence, and pace, and moderate to marked impairment in deterioration or decompensation in work or work-like settings. Dr. Leonberger stated that Prodes' medical problems limited his ability to physically perform many jobs and his chronic depression appeared to affect his employability significantly. Dr. Leonberger assigned a Global Assessment Function of 45 currently and 45 within the past year.

On November 11, 2008, Prodes saw Michael Figura, DPM. Prodes' chief complaints were constant numbness, pain, and cramps in his feet. Dr. Figura again confirmed Prode's diabetic neuropathy diagnosis. He recommended diabetic foot education, and continued medication.

<u>Vocational Evidence Before the ALJ</u>

Jeffery Magrowski, a vocational expert, also testified before the ALJ, stating that Prodes had above average reasoning, math, and language skills. The VE concluded that Prodes would have some skills in management, scheduling, instruction or teaching, some sales or negotiating of agreements, taking orders,

counseling, communicating, problem solving, and some clerical skills involved in completing reports. The ALJ then asked the VE to assume some hypothetical situations for an individual with Prodes' education, training, and work experience. In the first hypothetical, the VE was also asked to assume the individual could lift/carry 50 pounds; stand/walk six hours out of eight; sit six hours out of eight; climb stairs and ramps occasionally; climb ladders and scaffolds occasionally; never climb ropes; push and pull with the legs occasionally; respond appropriately to supervisors and co-workers in a task oriented setting where contact with others was casual and infrequent; and perform some complex tasks. The VE concluded that this individual could work as a hand packer, stocker, or laundry worker.

The second hypothetical required assuming that the individual could lift/carry 20 pound occasionally; could lift/carry 10 pounds frequently; needed a sit/stand option at the work site with the ability to alternate frequently; could never push or pull with the legs; had the ability to understand, remember, and carry out simple instruction on non-detailed tasks; could maintain concentration for two hours in an eight hour period; and demonstrated adequate judgment to make simple work related decisions; but could not maintain regular contact with the general public. The ALJ concluded that the individual obviously would not be able to perform Prodes' past work. The VE concluded that such an individual

would be able to perform packing work on smaller items, do simple assembly work, and work as a mail clerk or sorter.

The third hypothetical was the same as the second, but the ALJ added that the individual could miss up to three days a month because of depression and ability to get to work and could be late up to four times a month. The VE concluded that the individual could not maintain a regular job. The fourth hypothetical was posed by Prodes' attorney who asked the VE to assume an individual with Prodes' education, training, and work experience could only lift 10 pounds frequently, lift 20 pounds on occasion, and needed a sit/stand option with allowance for leaving the work station frequently, staying within a close proximity. The VE concluded that the individual could not maintain a regular job.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id*., or

because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)    the credibility findings made by the Administrative Law Judge;

(2)    the claimant's education, background, work history, and age;

(3)    the medical evidence from treating and consulting physicians;

(4)    the claimant's subjective complaints relating to exertional and non-exertional impairments;

(5)    any corroboration by third parties of the plaintiff's impairments; and

(6)    the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national

economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id*. at 1322.

## The ALJ's Findings

The ALJ found that Prodes was not disabled within the meaning of the Social Security Act from July 17, 2007 through the date of the decision. He issued the following specific findings:

> 1. The claimant met the insured status required of the Social Security Act through December 31, 2011.

2.   The claimant had not engaged in substantially gainful activity since July 17, 2007, the alleged on set date (20 CFR § 404.1571 *et seq.*, 416.971 *et seq*).

3.   The claimant had the following severe impairments: diabetes mellitus with neuropathy and affective mood disorder (20 CFR §§ 404.1521 *et seq.* and 416.912 *et seq*).

4.   The claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1525, 404.1526, 416.925, and 416.926).

5.   The claimant had the residual function capacity to perform work involving lifting up to twenty pounds, with no frequent lifting or carrying in excess of ten pounds, which coincides with "light" work in 20 CFR §§ 404.1567(b), 416.967(b), and Social Security Ruling 83-14. He would need to work in a job where he would have the option to frequently alternate between sitting and standing. He had the ability to climb stairs/ramps/ladders/scaffolds, but could never climb ropes. He could not use his feet for pushing and/or pulling. The claimant had additional nonexertional limitations associated with his mental impairment that would preclude him from working in circumstances where there would be constant regular contact with the general public. He retains the ability to understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two-hour segments over and eight-hour period; and demonstrate adequate judgment to make simple work related decisions.

6.   The claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).

7.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job

skills (See SSR 82-41 and 20 CFR § 404, Subpart P, Appendix 2).

8.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR §§ 404.1569, 404.1569a, 416.969, and 416.969a).

The ALJ doubted the credibility of Prodes' testimony regarding the intensity, persistence, and limiting effects of his symptoms to the extent the testimony was inconsistent with the residual function capacity determination. The ALJ found that Prodes was not precluded from working by his diabetes or his mental health. He noted that Prodes' own noncomplaince with his treatment regimen appeared to have played a significant role in the persistence of his diabetes and mental health symptoms. The ALJ also noted that the receipt of unemployment benefits could be seen as inconsistent with allegations of disability. He gave little weight to the opinion of Dr. Leonberger.

## Discussion

As previously mentioned, when ruling on a denial of Social Security benefits, a court must determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g). Substantial evidence is less than a proponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Juszczyk v. Astrue*, 349 F.3d 626, 631 (8th Cir. 2008). Additionally, review of a Commissioner's

decision is deferential. *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005). Because I find that the decision denying benefits was supported by substantial evidence, I will affirm the decision.

The testimony of the vocational expert (VE) contributed to the record as a whole's support for the ALJ decision. Once it is determined, as it was here, that the claimant cannot perform past relevant work, the burden shifts to the Commissioner to show that the claimant can perform other work as it exists in the national economy. *Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994). Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005). To be properly phrased, the hypothetical question posed to a VE must include all physical and mental impairments the ALJ finds to be credible, *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994), even if the impairments are not disabling in and of themselves, *Grissom*, 416 F.3d at 837. Here, the ALJ failed to include the squatting limitation, but doing so was not essential to the ultimate denial of benefits. The record consists of hundreds of pages of evidence and only one doctor on one occasion mentioned the squatting limitation. Further, it was October 25, 2007, when Dr. Mendoza noted the squatting limitation, but on March 27, 2008, Dr. Cass noted that Prodes had a full range of motion. Most

importantly, Prodes alleged disability as a result of diabetes, depression, and bipolar disorder, and each of those allegations was sufficiently addressed.

Additionally, the VE's reliance on the Dictionary of Occupational Titles (DOT) was not misplaced. Prodes offered a letter from the United States Department of Labor, with 2007 date, stating that the DOT was obsolete. I, however, must apply the law as it is written. Today, 20 C.F.R. § 416.968(a) still allows for reliance on the DOT. Additionally, the United States Court of Appeals for the Eighth Circuit has held that reliance on the DOT is proper, *Jones v. Carter*, 86 F.3d 823, 826 (8th Cir. 1996), and the Eighth Circuit has cited to the 1991 edition of the DOT in a decision as recent as October 15, 2010, *see Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010). Thus, the VE and the ALJ's reliance on the DOT was not in error.

The ALJ's narrative discussion of the rationale for the residual function capacity (RFC) is sufficient for me to find that substantial evidence on the record as a whole supports the ALJ's decision. The RFC assessment is required to include a discussion of why reported symptoms-related function limitations and restrictions can or cannot be accepted as consistent with the medical or other evidence. SSR 96-8p at *7. It must also include "a narrative discussion describing how the evidence supports each conclusion, citing medical facts." *Id.* The ALJ, however, is not limited to considering medical evidence and is only

required to consider some supporting evidence from a professional.  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  The ALJ may also rely on other relevant evidence including "observations of ... others, and the claimant's own description of his or her limitations."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  Further, the ALJ is not required to discuss, in detail, every item of evidence.  *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).  And I may consider all of the ALJ's analysis, not just his summary or conclusions.  *Wies v. Astrue*, 552 F.3d 728, 733-34 (8th Cir. 2009).

Here, the ALJ provided a five page narrative following the RFC assessment. Prodes argues that the ALJ failed to provide a narrative discussion describing the specific evidence supporting the finding that Prodes could lift up to twenty pounds with no frequent lifting or carrying in excess of ten pounds and that Prodes could only "maintain concentration and attention for two hour segments over and eight hour period."  Prodes also takes issue with the ALJ's failure to include his inability to squat.  When looking at the record as a whole, Prodes' own description of his ability, and lack thereof, to lift and carry McDonalds' tea bags, laundry, and gallons of milk provides a sufficient basis for the ALJ's determination of Prodes' lifting and carrying ability.  Although the ALJ did not find Prodes credible, lifting and carrying were discussed in detail in the record.  I am not able to find any basis in the record for the concentration limitation and the defendant, in its brief, was

not able to point to any evidence to support that particular conclusion. The

evidence actually indicates that Prodes could only sit for two of eight hours, but

neither the concentration limitation nor the squatting limitation, referenced by one

single report in the record, was essential to the denial of benefits as a whole.

While the social security rulings outlining the requirements for a narrative

description are binding on the ALJ, *Carter v. Sullivan*, 909 F. 3d 1201 (8th Cir.

1990) (per curiam), leaving out a limitation that is not likely to be credited or that

does not support a non-essential finding does not by itself mean the decision of the

ALJ must be reversed, especially where, as here, the decision is otherwise

supported by substantial evidence. The Eighth Circuit has held that "an 'arguable

deficiency in opinion-writing technique' does not require [it] to set aside an

administrative finding when that deficiency had no bearing on the outcome."

*Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992).

When controlling weight is given to a treating source's opinion the factors

in 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6) are not required to be

evaluated. Both Dr. Leonberger and Dr. Mades were consulting physicians, not

treating physicians. The ALJ discredited Dr. Leonberger's opinion because Dr.

Leonberger found that Prodes was functioning "at a GAF level of 45 " with

"marked impairment in social functioning/maintaining concentration, persistence,

and pace," but Dr. Leonberger only saw Prodes once and "[o]ther mental health

specialists who [had] seen the claimant [had] not identified him as so significantly limited." The ALJ was referring to all of the mental health specialists in the record, including Prodes' treating physicians, because none had found such significant limitations. In fact, Dr. Bjorn stated that Prodes' alleged bipolar disorder was stable. Dr. Jones, who saw Prodes at least four times, observed that Prodes was alert, cooperative, had a normal gait, was only slightly depressed, had a mood that was a "little stable," and that his medication was helping a bit. Dr. Jones assigned a GAF of 50/55. Dr. Barker, who saw Prodes a number of times, observed positive changes from his medication. The GAF that Dr. Mades assigned was only listed as an example of an assessment inconsistent with Dr. Leonberger's assessment. The record also supports weight being afforded to the treating physician's opinions, so a detailed evaluation of Dr. Mades' opinion was not required by 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6).

The ALJ's assumption that referral to vocational rehabilitation services suggested that the individual referring Prodes considered him fit for employment was not relevant to the ALJ's ultimate determination. Ultimately, the ALJ found that Prodes was not credible and was not disabled within the meaning of the Act, because his receipt of unemployment benefits was inconsistent with allegations of disability and because Prodes' non-compliance with his treatment regime contributed to the continuation of his physical and mental symptoms. What the

referral to vocational rehabilitation meant was not outcome determinative since the decision of the ALJ was supported by the substantial evidence on the record as a whole. For these reasons, the ALJ's decision in this case is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner denying benefits is affirmed. A separate judgment in accord with this Memorandum and Order will be entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 15th day of March, 2011.